UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

---

---------------------------------------------------------
THOMAS BAIRD, Individually and on Behalf
of All Others Similarly Situated,

       Plaintiff,

v.

MULTIMEDIA GAMES HOLDING
COMPANY, INC., STEPHEN J.
GREATHOUSE, STEPHEN P. IVES, NEIL E.
JENKINS, MICHAEL J. MAPLES, SR.,
JUSTIN A. ORLANDO, PATRICK J.
RAMSEY, ROBERT D. REPASS, GLOBAL
CASH ACCESS HOLDINGS, INC., and
MOVIE MERGER SUB, INC.,

       Defendants.
---------------------------------------------------------

Civil Action No. _____

**JURY TRIAL DEMAND**

---

## CLASS ACTION COMPLAINT

1.    Plaintiff Thomas Baird ("Plaintiff"), by his attorneys, brings the following class action on behalf of himself and all shareholders of Multimedia Games Holding Company, Inc. ("Multimedia Games" or the "Company"), other than Defendants (defined below) and their affiliates, against Multimedia Games, certain officers and members of Multimedia Games' board of directors (the "Board" or the "Individual Defendants"), Global Cash Access Holdings, Inc. ("GCA" or "Global Cash"), and Movie Merger Sub, Inc. ("Merger Sub") for breaching their fiduciary duties in connection with GCA's proposed acquisition of all the outstanding stock of Multimedia Games (and/or aiding and abetting thereof). The allegations in this Complaint are based on information and belief, including investigation of counsel and review of publicly available information, except for Plaintiff's own acts, which are alleged on personal knowledge.

2.      Multimedia Games is a Texas corporation headquartered in Austin, Texas.  The Company designs, manufactures, and distributes advanced gaming technology for the Native American and commercial casino markets with product offerings in video slots, reel-spinning slot machines, video lottery terminals, electronic scratch ticket systems, electronic instant lottery systems, back-office systems, and bingo systems.

3.      On September 8, 2014, Multimedia Games and GCA announced that they had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") under which GCA will acquire all outstanding shares of Multimedia Games (the "Proposed Transaction" or "Merger").  Pursuant to the Merger Agreement, Multimedia Games shareholders will receive $36.50 in cash, without interest (the "Merger Consideration"), for each share of the Company's common stock they own.  The Proposed Transaction is valued at $1.12 billion and is expected to close in early 2015.

4.      As described below, both the Merger Consideration that Multimedia Games' shareholders stand to receive and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and all other public shareholders of the Company.

5.      Tellingly, while the gaming industry as a whole has struggled in recent years as a result of the global recession, Multimedia Games' business has boomed.  As one news report on the Proposed Transaction states, "[t]he investment community's opinion on Multimedia Games has done a 180-degree turn over the past 36 months.  The company's revenue and profit exceeded expectations every quarter."[1]  And as another journalist covering the Proposed

---

[1] Howard Stutz, *Once ignored, Multimedia Games now may see other suitors*, LAS VEGAS REVIEW-JOURNAL, September 17, 2014, http://www.reviewjournal.com/columns-blogs/inside-gaming/once-ignored-multimedia-games-now-may-see-other-suitors.

Transaction wrote, "**unlike its peers, Multimedia sports a rock-solid balance sheet with $3 a share in net cash, which could in time lead to a dividend initiation**."[2]  Indeed, some analysts have valued the Company **as high as $40 to $45 per share, s**ignificantly higher than the consideration the Company's shareholders stand to receive under the terms of the Merger Agreement.[3]

6.      In addition to failing to obtain fair consideration for the Company's shareholders, The Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that unfairly favor GCA and discourage other potential bidders from submitting a superior offer for the Company.  These preclusive devices include: (i) a non-solicitation provision that restricts the Board from soliciting other potentially superior offers; (ii) an "information rights" provision, which provides GCA with unfettered access to information about other potential proposals, gives GCA four business days to negotiate a new deal with Multimedia Games in the event a competing offer emerges, and provides GCA with the perpetual right to attempt to match any superior bid; and (iii) a termination fee of $11 million if Merger Agreement is terminated in connection with the Company entering into a definitive agreement with respect to a superior proposal prior to October 8, 2014.  However, in the event that a definitive agreement could not be finalized by that date, which is likely given the short timeframe, the termination fee nearly triples to $32.5 million.  These provisions conjunctively and improperly restrain the Board's ability to act with

---

[2] David Englander, *Multimedia Games Holdings: A Slot-Machine Maker Worth a Bet*, BARRON'S, September 6, 2014, http://online.barrons.com/news/articles/ SB51885783724964273656104580129901573015476.

[3] *Id.*

respect to investigating and pursuing superior proposals and alternatives to the Proposed Transaction.

7.      Furthermore, in connection with the Proposed Transaction, on September 30, 2014 Multimedia Games filed a Preliminary Proxy Statement on Schedule 14A ("Proxy") with the U.S. Securities and Exchange Commission ("SEC") that fails to provide material information and contains materially misleading statements concerning the Proposed Transaction.   As explained below, while the Proxy provides some detail about the sales process the Board undertook, it fails to disclose a host of material information concerning the Proposed Transaction including, among other things: (i) the process leading up to the consummation of the Merger Agreement; and (ii) the data and key inputs underlying the financial analyses performed by Wells Fargo Securities, LLC ("Wells Fargo"), Multimedia Games' financial advisor in connection with the Merger; and (iii) certain financial projections prepared by Multimedia Games' management and relied upon by Wells Fargo in rendering its opinion as to the fairness of the Proposed Transaction to Multimedia Games' shareholders ("Fairness Opinion"), including but not limited to the free cash flows for Multimedia Games for fiscal years 2015 through 2019.

8.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and candor.

### JURISDICTION AND VENUE

9.      The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332. Plaintiff is a citizen of Ohio while Defendants are all citizens of other states, and the amount in controversy exceeds $75,000.   Indeed, the value of the Proposed Transaction is approximately $1.12 billion.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Multimedia Games maintains its primary place of business in this District.

**PARTIES**

11.     Plaintiff is, and has been at all relevant times, the owner of Multimedia Games shares and has held such shares since prior to the wrongs complained of herein.  Plaintiff is a citizen of Ohio.

12.     Multimedia Games is a Texas corporation with its corporate headquarters located at 206 Wild Basin Road South, Building B, 4th Floor, Austin, Texas, 78746.  The Company develops and distributes gaming technology, and is a creator and supplier of comprehensive systems, content and electronic gaming units for Native American and commercial casinos. Multimedia Games' common shares trade on the NASDAQ stock exchange under the symbol "MGAM."

13.     Defendant Stephen J. Greathouse ("Greathouse") has been a director of the Company since April 2009 and has served as Chairman of the Board since March 2011. Greathouse is a citizen of Nevada.

14.     Defendant Stephen P. Ives ("Ives") has been a director of the Company since January 2014.  Ives is a citizen of the United Kingdom.

15.     Defendant Neil E. Jenkins ("Jenkins") has been a director of the Company since October 2006.  Jenkins is a citizen of Illinois.

16.     Defendant Michael J. Maples Sr. ("Maples") has been a director of the Company since August 2006.  Maples is a citizen of Texas.

17.     Defendant Justin A. Orlando ("Orlando") has been a director of the Company since April 2011.  Orlando is a citizen of New York.

18.     Defendant Patrick J. Ramsey ("Ramsey") has served as both Multimedia Games'
Chief Executive Officer ("CEO") and a Company director since September 2010.  Ramsey is a
citizen of Nevada.

19.     Defendant Robert D. Repass ("Repass") has been a director of the Company since
July 2002.  Repass is a citizen of Texas.

20.     Defendant Global Cash is a Delaware corporation with its corporate headquarters
in Las Vegas, Nevada.  Global Cash provides cash, credit, and payment technology to casinos.
Global Cash's products and services provide: (a) gaming establishment patrons access to cash
through a variety of methods, including automated teller machine cash withdrawals, credit card
cash access transactions, point-of-sale debit card transactions, check verification and warranty
services and money transfers; (b) integrated cash access devices and related services, such as slot
machine ticket redemption and jackpot kiosks to the gaming industry; (c) products and services
that improve credit decision making, automate cashier operations and enhance patron marketing
activities for gaming establishments; (d) compliance, audit and data solutions; and (e) online
payment processing solutions for gaming operators in states that offer intra-state, internet-based
gaming and lottery activities.  Global Cash common shares are traded on the New York Stock
Exchange under the symbol "GCA."

21.     Merger Sub is a Texas corporation and a wholly-owned subsidiary of Global
Cash, and was created for purposes of effectuating the Proposed Transaction.

22.     The Individual Defendants, Multimedia Games, Global Cash and Merger Sub are
collectively referred to as the "Defendants."

### THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of the Individual Defendants' positions with the Company as directors
and/or officers, said individuals are in a fiduciary relationship with Plaintiff and the other public

shareholders of Multimedia Games and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, loyalty, and candor.

24.     By virtue of their positions as directors and/or officers of Multimedia Games, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Multimedia Games to engage in the practices complained of herein.

25.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders, and with due care.  To diligently comply with these duties, the directors of a corporation may not take any action that:

a.     Adversely affects the value provided to the corporation's shareholders;

b.     Contractually prohibits them from complying with or carrying out their fiduciary duties;

c.     Discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

d.     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

26.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of Multimedia Games, including their duties of loyalty, good faith, independence, and candor.

**CLASS ACTION ALLEGATIONS**

27.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Multimedia Games common stock who are being and will be harmed by Defendants' actions described below (the

7

"Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

28.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of July 24, 2014 there were over 29.6 million shares of Multimedia Games common stock outstanding.   The holders of these shares are believed to be geographically dispersed through the United States;

b.      There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

 i.      Whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, due care, and/or candor with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

 ii.     Whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

 iii.    Whether the Individual Defendants have breached any of their fiduciary duties to Plaintiff and to the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, and fair dealing;

 iv.     Whether Multimedia Games, GCA, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty;

 v.      Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

 vi.     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

c.       Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.       Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.       The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

f.       Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**A.       Multimedia Games' Background & Recent Financial Performance**

29.       Founded in 1991, Multimedia Games develops and distributes gaming technology.  The Company creates and supplies comprehensive systems, content, and electronic gaming units for Native American and commercial casinos.  It also sells gaming units and systems that feature proprietary game content and game themes licensed from others.  In addition, the Company supplies the central determinant system for the video lottery terminals (VLTs) installed at racetracks in the State of New York.  The Company focuses on pursuing new product development for commercial and tribal casinos and VLT markets. The Company's games include classic 3-reel games that provide players with traditional slot gaming experience; video reel games; High Rise Games, which are participation slot games; and TournEvent, a slot

tournament system that allows operators to switch from in-revenue gaming to out-of-revenue tournaments.

30.     TournEvent, the Company's linked slot machine product that allows casinos to run multiple tournaments, has received rave revues and is currently deployed in over 250 casinos nationwide with over 4,000 gaming units as of June 30, 2014.  Multimedia Games is also nearing 20,000 slot machines in the U.S. market, and has consistently taken casino floor space away from its biggest competitors – IGT, Bally, and WMS – while its share price has increased.  The Company recently announced that it is unveiling its largest-ever and most diverse display of new products, including 100 unique new games, at a major gaming industry convention being held this year.

31.     While the gaming industry as a whole has struggled in recent years, Multimedia Games' business and earnings have boomed.  In the past year, amid a difficult environment, the Company's total number of installed games has increased by 8%, and its revenue and earnings continue to move higher.   Some analysts have predicted 25% growth for the Company over the next year.   Indeed, despite the challenges in the industry, Multimedia Games has grown faster than its larger rivals as the Company expands into new lucrative markets.

32.     On April 30, 2014, Multimedia Games announced impressive operating results for its fiscal 2014 second quarter.  Specifically, the Company reported that revenue rose 25% to $58.2 million, and EBITDA increased by 28%, to a record $30.7 million.  The Company also announced that it had entered into a definitive merger agreement to acquire electronic table games developer and distributor, PokerTek, Inc. ("PokerTek"), for a total consideration of approximately $13 million.  The Company expects the PokerTek acquisition to be accretive to its financial results beginning in fiscal 2016.

33.     Commenting on the strong second quarter results, defendant Ramsey, the Company's CEO, stated:

> The results were driven by an impressive 88.6% year-over-year increase in unit sales as we sold 1,094 games, with continued strength in key markets such as Oklahoma, Washington and Nevada… **our gaming operations business continues to perform, with revenue increasing 13.0% year over year to a quarterly record of $37.8 million in the fiscal 2014 second quarter.** Our installed base of participation games rose 8.9% year-over-year and approximately 1% on a quarterly sequential basis, and we ended the fiscal 2014 second quarter with a total of 12,752 recurring revenue units nationwide… **These are exciting times for Multimedia Games as we continue to successfully penetrate new markets while increasing the number of our innovative and player-favorite games on slot floors in the Company's more established markets**.

34.     Subsequently, the Company announced that for the most recent quarter ended June 2014, revenue from gaming operations increased by 11% from the same period last year, to a record $38 million.  Total revenue was also up $2.2 million.

35.     Commenting on the 2014 fiscal third quarter financial results, defendant Ramsey stated:

> Our 2014 fiscal third quarter financial results are in-line with our previously stated expectations and highlight the Company's ability to introduce differentiated games that are helping us to further grow our presence on casino slot floors despite the challenging North American gaming environment… Our gaming operations business continues to be a source of strength for Multimedia Games, as our installed base grew by 1,004 units year over year and by 415 units on a quarterly sequential basis to reach 13,167 total units. Our higher-yielding premium participation games continue to achieve notable success, with the installed base of our premium games growing by 118 units in the quarter to reach 1,288 total units, or approximately 10% of our total installed base… We believe our third quarter results again demonstrate the Company's ability to create games that excite players and deliver value to operators, and we remain focused on further growing our overall share of North American slot floors. Our new premium participation products are expected to drive further growth in our installed base and win per day going forward and represent a key piece of our long-term strategy. We are also pursuing initiatives that will enable us to deliver high levels of player satisfaction and generate continued top- and bottom-line growth, including investments in new product development and in our installed base as well as the completion of the PokerTek transaction.

36.     In sum, Multimedia Games is well positioned to generate significant earnings in the foreseeable future spurred by its rapidly expanding customer base in major markets, increasingly popular products, and innovative gaming content.  Despite Multimedia Games' bright financial prospects, the Board has now agreed to sell the Company at a price below its intrinsic value to the detriment of Multimedia Games' common shareholders.

**B.     The Proposed Transaction Undervalues Multimedia Games Shares**

37.     On September 8, 2014 Multimedia Games and  GCA issued a press release announcing the Proposed Transaction, which states in relevant part:

> Las Vegas, NV and Austin, TX — September 8, 2014 — Global Cash Access Holdings, Inc. (NYSE: GCA) and Multimedia Games Holding Company, Inc. ("Multimedia Games") (Nasdaq: MGAM) announced today that they have entered into a merger agreement whereby GCA has agreed to acquire all the outstanding common stock of Multimedia Games for $36.50 per share, for an aggregate purchase price of approximately $1.2 billion in cash. The transaction has been unanimously approved by the boards of directors of the two companies.

> "The acquisition of Multimedia Games represents a gaming-relevant transformational opportunity to combine two companies with rich gaming heritages and uniquely positions GCA as an important strategic partner to gaming operators by offering them deeper and more integrated solutions across their entire gaming floor," remarked Ram V. Chary, President and Chief Executive Officer of GCA. "This acquisition further strengthens and broadens GCA's portfolio of solutions, which has been embraced by our customer base," added Mr. Chary.

> Patrick J. Ramsey, Chief Executive Officer of Multimedia Games, noted, "We are excited about the opportunity this combination provides to leverage Multimedia Games' creative and innovative game development capabilities with GCA's expansive customer base to provide best-in-class, integrated solutions to the gaming community, and deliver increased value and scale to our respective customers and employees."

> Transaction Highlights

> Pursuant to the merger agreement, GCA will acquire all of the outstanding stock of Multimedia Games for $36.50 per share in cash, representing a 31% premium to the closing stock price as of Friday, September 5, 2014, for an aggregate purchase price of approximately $1.2 billion. The proposed acquisition will be

financed with debt and cash on hand for which GCA has secured committed debt financing. The proposed acquisition is subject to customary closing conditions, including receipt of MGAM shareholder approval and antitrust and gaming regulatory approvals, and is currently expected to be completed in early 2015.

The merger is expected to achieve approximately $30 million of synergies as a combined entity; and, on a pro forma basis, is estimated to generate about $800 million in revenues and approximately $217 million in Adjusted EBITDA based on the last twelve months results as of June 30, 2014. The transaction is expected to be immediately accretive to GCA stockholders as of the closing date of the acquisition.

Ram V. Chary will continue to serve as President and Chief Executive Officer of GCA. The combined company's headquarters will remain in Las Vegas, NV and its game development operations will be based in Austin, TX.

Advisory Partners

The advisory partners for Global Cash Access included: BofA Merrill Lynch as its exclusive advisor on financial matters; and Pillsbury Winthrop Shaw Pittman and DLA Piper as advisors on legal matters. The advisory partners for Multimedia Games included: Wells Fargo Securities as its exclusive advisor on financial matters; and Latham & Watkins as advisor on legal matters.

BofA Merrill Lynch and Deutsche Bank have agreed to provide committed debt financing to Global Cash Access for the proposed acquisition.

38.    The $36.50 per share total Merger Consideration Multimedia Games' public shareholders stand to receive is insufficient, as it fails to account for the Company's significant future earning potential and falls well below the $40 to $45 per share price analysts expected the Company's shareholders to receive in connection with a merger.

39.    Indeed, as one analyst recently wrote, "[t]he company's strengths can be seen in multiple areas, such as its revenue growth, largely solid financial position with reasonable debt levels by most measures, expanding profit margins and notable return on equity."[4]

---

[4] Scott Olson, *Today's Perilous Reversal Stock: Multimedia Games (MGAM)*, THE STREET, August 4, 2014, http://www.thestreet.com/story/12832124/1/todays-perilous-reversal-stock-multimedia-games-mgam.html.

40.     Further, Multimedia Games has only recently acquired licenses to operate in major markets including Nevada, New Jersey, Oregon, Pennsylvania, Illinois, Mississippi, Louisiana and Canada.  Industry analysts have stated that "Multimedia Games appears on the cusp [of] cracking the manufacturing sector's upper echelon."[5]  Indeed, as one financial reporter wrote, "[t]he growth opportunity in Multimedia Games is large.  In Nevada, Pennsylvania, New Jersey, and Oregon, the company has less than a 0.5% market share.  According to [an analyst] if Multimedia were to capture 3% of the market in those states, it would translate into 6,500 game sales.  [The analyst] sees the installed base climbing to 14,000 games by the end of 2015, with operating revenue up 11% this year and 9% in 2015."[6]

41.     In sum, Multimedia Games is poised to enjoy a lengthy period of significant growth, and the Proposed Transaction stands to prevent the Company's shareholders from attaining fair value for their shares.

## C.     The Windfall to the Individual Defendants

42.     The Proposed Transaction was also likely driven by the self-interest of certain Individual Defendants and the Company's officers.  As a result of the consummation of the Proposed Transaction, certain Multimedia Games officers and directors will receive lucrative change in control payments not shared by other shareholders.

---

[5] Howard Stutz, *Gambling's expansion has Multimedia Games on cusp of cracking manufacturing's upper echelon*, LAS VEGAS REVIEW-JOURNAL, August 5, 2013, http://www.reviewjournal.com/business/casinos-gaming/gamblings-expansion-has-multimedia-games-cusp-cracking-manufacturings-upper.

[6] David Englander, *Multimedia Games Holdings: A Slot-Machine Maker Worth a Bet*, BARRON'S, September 6, 2014, http://online.barrons.com/news/articles/SB51885783724964273656104580129901573015476.

43.    The aforementioned lucrative payments cast further doubt that the process leading up to the announcement of the Proposed Transaction was fair to Multimedia Games' shareholders.

**D.     The Preclusive Deal Protection Devices**

44.    In addition to failing to engage in a fair and reasonable sales process, the Individual Defendants, likely driven by their own personal interests, agreed to certain deal protection devices that operate conjunctively to deter other suitors from submitting a superior offer for the Company.

45.    First, the Merger Agreement provides for an onerous no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to comply with their fiduciary duties to obtain the best price possible under the circumstances. Specifically, section 6.5 of the Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) initiate, solicit or knowingly encourage or facilitate (including by way of providing non-public information) the making of any Acquisition Proposal or any inquiry, proposal or request for information that may reasonably be expected to lead to an Acquisition Proposal, or

> (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.5, engage in negotiations or substantive discussions with, or furnish any nonpublic information to, any Third Party relating to an Acquisition Proposal or any inquiry, proposal or request for information that may reasonably be expected to lead to an Acquisition Proposal.

46.    Furthermore, Section 6.5 of the Merger Agreement grants GCA recurring and unlimited matching rights, which provides GCA with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which GCA can use to prepare a matching bid; and (ii) four business days to negotiate with Multimedia Games, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

47.     The non-solicitation and matching rights provisions unfairly deter superior bidders from making a fair offer for the Company, as many will be hesitant to expend the time, cost, and effort of making a superior proposal while knowing that GCA can easily foreclose a competing bid.   As a result, these provisions unreasonably favor GCA, to the detriment of Multimedia Games' public shareholders.

48.     Lastly, section 8.3 of the Merger Agreement provides that Multimedia Games must pay GCA a termination fee of either $11 million in the event the Company is able to finalize the terms of a deal with a superior bidder before October 8, 2014, or a fee of $32.5 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal after October 8, 2014.   Further, this section provides that the Company may remain obligated to pay the $32.5 million termination fee in the event the Merger Agreement is terminated by either the Company or GCA under certain circumstances and the Company then enters into a transaction with another suitor within nine months.     These termination fee provisions further deter other suitors from making a superior proposal for the Company, as they will have to pay a naked premium for the right to provide Multimedia Games' shareholders with a better offer.

49.     Ultimately, these deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

**E.     The Incomplete & Materially Misleading Proxy**

50.     On September 30, 2014, Multimedia Games filed the Proxy with the SEC in connection with the Proposed Transaction.   The Proxy fails to provide the Company's shareholders with material information concerning both the process leading up to the consummation of the Merger Agreement and the financial analyses Wells Fargo performed in

support of its Fairness Opinion.  As a result of the incomplete and misleading Proxy, Multimedia Games' shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

      **I.**      **Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

51.      Specifically, the Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the Proxy fails to disclose the following information:

a.  The identities of the "13 additional parties" Banker 1 contacted to gauge their interest in a potential acquisition between May and July 2013 (*See* Proxy at 35);

b.  Whether the Board and/or Banker 1 discussed a particular premium that it sought when they informed Bidder B that its $25 per share offer was insufficient (*See* Proxy at 36);

c.  A fair summary of the process the Board undertook to pursue strategic transactions between August 28, 2013, the date Bidder C informed the Board it would not make a higher offer, and May 2014 (*See* Proxy at 36);

d.  A fair summary of the relationship between the representatives of Bidder D that were involved in the process and the Individual Defendants or Company management, including defendant Ramsey (*See* Proxy at 36);

e.  The reason why the Board did not contact Banker 1 concerning engagement as its financial advisor in connection with the Proposed Transaction, even though the Board had previously engaged Banker 1 regarding a potential transaction with Bidder A (*See* Proxy at 37);

f.  A fair summary of the "preliminary financial analysis of the company" that Wells Fargo reviewed with the Board on July 29, 2014 (*See* Proxy at 37);

g.  A fair summary of the communications Ramsey received from Bidder A and GCA, as he provided to the Board during the August 2, 2014 special telephonic meeting (*See* Proxy at 38);

h.  A fair summary of the "strategies designed to maximize shareholder value" that the Board discussed during its August 2, 2014 special telephonic meeting (*See* Proxy at 38);

i.  The terms of the "preliminary proposal" that Mr. Ramsey discussed with Mr. Chary on August 2, 2014 (*See* Proxy at 38);

j.  The reason why the Board felt it was necessary to circulate a formal memorandum regarding "confidentiality, neutrality, and [the Board's] managing role in the process of negotiating a strategic transaction" on August 8, 2014, despite the fact that the Board had already previously instructed management on these issues in 2013 and May 2014 (*See* Proxy at 38);

k.  The reason why the Board decided on August 15, 2014  to focus on negotiations with Bidder D and GCA rather than make additional outbound inquires (*See* Proxy at 39);

l.  A fair description of the "certain provisions unique to a financial sponsor" that were included in the draft merger agreement delivered to Bidder D on August 28, 2014, as such provisions were not included in the draft merger agreement provided to GCA (*See* Proxy at 41);

m.  A summary of the jurisdictions in which the Board believed a gaming license would be required to complete a transaction with both Bidder D and GCA, and the specific

number of jurisdictions that both Bidder D and GCA were licensed in as of August, 2014, which is material to the Company's shareholders in light of the fact that the Proxy makes repeated references to the fact that a transaction with Bidder D was expected to "require a significant delay before closing" as a result of the fact that it was not licensed in nearly as many jurisdictions as GCA  (*See* Proxy at 39, 40, 46);

n.  A fair summary of the Board's and Wells Fargo's discussion concerning the "risk that the maximum contingent consideration would not be paid" in connection with Bidder D's offers, which is material to the Company's shareholders because this "risk" served as the basis for the Board's conclusion that Bidder D's offer of potentially greater consideration did not warrant further exploration after August 28, 2014  (*See* Proxy at 39, 41);

o.  The reason why the Board and/or Wells Fargo failed to engage in any further discussions with Bidder D after it communicated to Wells Fargo on August 28, 2014 that it was not willing to provide a revised draft of the merger agreement unless it was granted exclusivity or Multimedia Games agreed to reimburse its expenses, or if any further discussion with Bidder D did occur, a fair summary of such discussions (*See* Proxy at 41);

p.  Details concerning the ticking fee that was included in the draft merger agreement Latham & Watkins sent to GCA on September 3, 2014, including the amount the fee would increase the per share consideration if the closing of the Proposed Transaction was delayed, and the date or time period by which the Proposed Transaction needed to be completed by in order to prevent the ticking fee provision from becoming effective (*See* Proxy at 41);

q. A fair summary of the substance of the conversation between Mr. Ramsey and Mr. Chary on September 4, 2014, during which they agreed to terminate negotiations, including if there was any discussion concerning the possibility of reopening negotiations under certain circumstances (*See* Proxy at 42);

r. The reason why the Board set an arbitrary deadline of September 8, 2014 as the date by which management and Latham &Watkins had to "continue to negotiate to improve the terms of the GCA proposal and finalize the merger agreement," (*See* Proxy at 42);

s. A fair summary of what the "remaining open issues" that were "negotiated and resolved" between Multimedia Games' and GCA's respective representatives during the course of September 6 and 7, 2014 (*See* Proxy at 43);

t. The identity of the members of Multimedia Games' Regulatory Compliance Committee, and a summary of the interests that members of the Committee have in the Proposed Transaction that may be different from or in addition to the interests of Multimedia Games' shareholders (*See* Proxy at 43); and

u. A fair summary of the "findings of suitability" the Multimedia Games' Regulatory Compliance Committee delivered to the Board in connection with its consideration of the Merger Agreement (*See* Proxy at 43).

II.     **Materially Incomplete and Misleading Disclosures Concerning Wells Fargo's Financial Analyses**

52.     While the Proxy discloses certain information regarding the financial analyses Wells Fargo performed to support its Fairness Opinion, the information is incomplete and misleading because it fails to provide, amongst other things, the following:

53.     With respect to Wells Fargo's *Selected Public Companies Analysis*, the Proxy fails to disclose:

a.  The metrics for each of the three companies used in the analysis, as opposed to only the range of the lowest to highest metrics (*See* Proxy at 54);

b.  The basis for selecting September 5, 2014, as the date on which Scientific Games Corporation's stock closing price was used in connection with the analysis, as opposed to a date prior to the time Scientific Games announced its acquisition of Bally Technologies, Inc. ("Bally"), as the dates selected for both Bally and International Game Technology were each **prior** to the announcement of their respective transactions (*See* Proxy at 53); and

c.  The financial multiples for certain publicly traded international gaming equipment manufacturing companies, including Ainstworth Game Technology Ltd., Aristocrat Leisure Ltd. And GTECH S.p.A., which Wells Fargo reviewed in connection with its analysis (*See* Proxy at 54).

54.     With respect to Wells Fargo's *Precedent Transaction Analysis*, the Proxy fails to disclose:

a.  The mean and median multiples in connection with the range of multiples calculated for the transaction firm value as a multiple of LTM, EBITDA for the target (*See* Proxy at 55);

b.  The mean and median multiples in connection with the range of multiplies calculated for the purchase price as a multiple of LTM EPS for the target (*See* Proxy at 55);

c.  The basis for selecting a 2014E EBITDA multiple range of 6.6x to 10.5x (*See* Proxy at 55);

d.  The basis for selecting a 2014E Net Income multiple range of 16.9x to 21.0x (*See* Proxy at 55); and

e.  The mean and median implied equity values per share in connection with the calculated ranges of $27.33 to $41.30 and $20.51 to $25.34 (*See* Proxy at 55).

55.     With respect to Wells Fargo's *Discounted Cash Flow Analysis* ("DCF"), the Proxy fails to disclose:

a.  The net present value of the projected after-tax unlevered free cash flows for Multimedia Games for the fiscal years 2015 through 2019, as calculated by Wells Fargo in connection with its DCF analysis (*See* Proxy at 55);

b.  Multimedia Games' weighted average cost of capital ("WACC") and a fair summary of the "standard corporate finance methodologies" that Wells Fargo used to calculate WACC (*See* Proxy at 55);

c.  Multimedia Games' estimated book value of debt less cash and cash equivalents as of September 30, 2014, which was utilized by Wells Fargo in connection with its DCF analysis  (*See* Proxy at 55); and

d.  The number of fully diluted shares outstanding utilized by Wells Fargo to calculate a range of implied per share values for Multimedia Games (*See* Proxy at 56).

56.     The Proxy also fails to disclose the following miscellaneous material information:

a.  The mean and median of the range of the $29.00 to $39.00 stock price targets that Wells Fargo observed and referenced in connection with its financial analysis (*See* Proxy at 56);

b.  The amount or portion of Wells Fargo's $10.4 million fee that was payable upon delivery of its opinion and the amount or portion of Wells Fargo's fee that is payable upon consummation of the Merger (*See* Proxy at 56).  This information is particularly important given that the Board, upon advice from Wells Fargo, decided to end negotiations with another bidder whose offer may have represented  a higher offer price but which presented more closing uncertainty; and

c.  The dollar value of the vested stock options and restricted stock units held by each of the Individual Defendants (*See* Proxy at 60).

57.     In sum, the Individual Defendants have breached their fiduciary duties owed to Multimedia Games' shareholders.  The Board failed to obtain reasonable consideration for Multimedia Games' shareholders, agreed to onerous deal protection devices that may prevent the emergence of a superior offer, failed to provide the Company's shareholders with material information concerning the Proposed Transaction that is necessary for shareholders to cast an informed vote on the Merger, and likely put their own personal interests ahead of those of Multimedia Games' shareholders while negotiating the terms of the Proposed Transaction.

58.     As a result of the aforementioned breaches of fiduciary duty, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Breach of Fiduciary Duties**

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.     The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Multimedia Games' shareholders.

61.     By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Multimedia Games.

62.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to Multimedia Games shareholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Multimedia Games' shareholders receive adequate consideration for their shares, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for the Company, and caused a materially incomplete and misleading Proxy concerning the Proposed Transaction to be filed with the SEC.

63.     By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

64.     As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Multimedia Games' assets and businesses, have been and will be prevented from obtaining a fair

price for their Multimedia Games common shares, and will not be able to cast an informed vote the Proposed Transaction.

65.     Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

66.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff and the Class Against Multimedia Games, GCA, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

67.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

68.     Multimedia Games, GCA, and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Multimedia Games' shareholders, and have participated in such breaches of fiduciary duties.

69.     Multimedia Games, GCA, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Multimedia Games, GCA, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

## COUNT III

### On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act Against the Company and the Individual Defendants

70.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

71.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

73.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

74.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

75.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT IV

**On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

76.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Individual Defendants acted as controlling persons of Multimedia Games within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Multimedia Games, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false or materially incomplete and therefore misleading.

79.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

81.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

82.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

84.     Plaintiff has no adequate remedy at law.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

A.      Declaring this action to be a Class Action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.      Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's shareholders and discloses all material information regarding the Proposed Transaction;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance for attorneys' and expert fees and expenses; and

F.    Granting Plaintiff and other members of the Class such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 3, 2014.                      Respectfully submitted

                                      _____*/s/ Thomas E. Bilek*_____
                                      Thomas E. Bilek
                                      State Bar No. 02313525
                                      **THE BILEK LAW FIRM, L.L.P.**
                                      700 Louisiana, Suite 3950
                                      Houston, TX  77002
                                      (713) 227-7720

                                      *Attorneys for Plaintiff*

**OF COUNSEL**

Juan E. Monteverde
James M. Wilson, Jr.
Miles D. Schreiner
**FARUQI & FARUQI, LLP**
369 Lexington Ave., Tenth Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: jmonteverde@faruqilaw.com
        jwilson@faruqilaw.com
        mschreiner@faruqilaw.com

Evan J. Smith
BRODSKY & SMITH, LLC
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
610-667-6200
610-667-9029 (fax)