UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DAVID EYKYN and MIKE EYKYN, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. A:14-cv-00922-SS |
| Plaintiffs, | § | |
| | § | (Consolidated Lead Case) |
| v. | § | |
| | § | |
| MULTIMEDIA GAMES HOLDING COMPANY, INC., et al., | § § § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| CHRISTOPHER COFFMAN, Individually and on Behalf of All Others Similarly Situated, | § § | |
| | § | Civil Action No. A:14-cv-00966-SS |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| MULTIMEDIA GAMES HOLDING COMPANY, INC., et al., | § § | |
| | § | |
| Defendants. | § | |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS
UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT,
CERTIFICATION OF SETTLEMENT CLASS, AND AWARD OF
ATTORNEYS' FEES AND EXPENSES**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE LITIGATION AND BACKGROUND TO SETTLEMENT ..................................... 3

III.    THE SETTLEMENT TERMS .................................................................................. 4

IV.     THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED ..................... 5

        A.      The Fifth Circuit Favors Settlement of Class Actions and Presumes Fairness of
                Settlements Negotiated and Supported by Experienced and Competent Counsel .. 5

        B.      The Settlement Is Fair, Reasonable, and Adequate ................................................. 6

                1.      There Was and Is No Fraud or Collusion in Connection with the
                        Settlement ................................................................................................ 7

                2.      The Complexity, Expense, and Likely Duration of this Litigation Supports
                        the Settlement ........................................................................................... 7

                3.      The Stage of Proceedings and the Amount of Discovery Completed
                        Weighs in Favor of Settlement ................................................................... 9

                4.      The Probability of Success on the Merits and the Possible Range of
                        Recovery Supports the Settlement ............................................................ 10

                        a.      The Damages Claim ........................................................................ 10

                        b.      The Disclosure Claims .................................................................... 12

                                i.      Material Information Regarding Wells Fargo's Financial
                                        Analyses ........................................................................... 13

                                ii.     Disclosure of Compensation Paid to Wells Fargo Potential
                                        Conflict of Interest ........................................................... 18

                5.      The Opinion of Plaintiffs' Counsel and Settlement Class Members ........ 19

V.      THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(a) ........................... 20

        A.      The Numerosity Requirement Is Satisfied .......................................................... 20

        B.      The Commonality Requirement Is Satisfied ........................................................ 20

        C.      The Typicality Requirement Is Satisfied ............................................................. 21

        D.      The Adequacy Requirement Is Satisfied .............................................................. 21

        E.      The Proposed Settlement Satisfies Rule 23(b) ..................................................... 22

VI.     THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR REASONABLE
        ATTORNEYS' FEES AND EXPENSES ................................................................. 23

        A.      Plaintiffs Conferred a Substantial Benefit on MGAM Shareholders .................... 25

        B.      Fee Awards in Similar Cases and the Rates Charged in Similar Litigation ......... 26

        C.      The Experience, Reputation, and Ability of the Lawyers Performing the Services,
                the Time Limitations, and the Preclusion of Accepting Other Employment ........ 28

i

D.      The Time and Labor Required, the Novelty and Difficulty of the Questions Involved, and the Skill Requisite to Perform the Legal Service Properly ............ 29

E.      Plaintiffs' Counsel Litigated the Actions on a Fully Contingent Basis ................ 29

VII.   CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Aeroflex S'holders Litig.*,
    No. 003943/2007, slip op.(Nassau Cnty., NY June 30, 2009)..................................................27

*Ahearn v. Fibreboard Corp.*,
    162 F.R.D. 505 (N.D. Tex. 1995) ....................................................................................19

*In re Appraisal of Shell Oil Co.*,
    No. 8080, 1990 Del. Ch. LEXIS 199 (Del. Ch. Dec. 11, 1990), *aff'd*, 607 A.2d
    1213 (Del. 1992) ..........................................................................................................8

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000).................................................................................7

*Ayer v. Thompson*,
    358 F.3d 356 (5th Cir. 2004) .......................................................................................5, 24

*Berens v. Marshall & Isley Corp.*,
    No. CV 021273 (Milwaukee Cnty. Cir. Ct. Wis. June 19, 2012)............................................27

*Blum v. Stenson*,
    465 U.S. 886 (1984)..................................................................................................27, 28

*Boeing Co. v. Van Gernert*,
    444 U.S. 472 (1980)......................................................................................................25

*Brent v. Midland Funding, LLC*,
    No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763 (N.D. Ohio Sept. 11, 2011) ......................7

*Call4U, Ltd. v. Goodman Global, Inc.*,
    No. 2007-66888, slip op. (Harris Cnty. Tex. May 13, 2009).................................................26

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
    No. CV 11-2768 PSG, 2013 U.S. Dist. LEXIS 155091
    (C.D. Cal. Oct. 25, 2013)..............................................................................................23

*Collier v. Brightpoint, Inc.*,
    C.A. No. 1:12-cv-1016 (TWP)(DKL) (S.D. Ind. May 1, 2013) ...........................................27

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) .........................................................................................5

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ....................................................................................5, 6

*Culpepper v. Reynolds Metals Co.*,
   442 F.2d 1078 (5th Cir. 1971) ..............................................................................24

*David P. Simonetti Rollover IRA v. Margolis*,
   C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) .................16, 17, 19

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ...................................................................5, 6, 7

*In re Dell, Inc., Sec. Litig.*,
   No. A-06-CA-726-SS, 2010 U.S. Dist. LEXIS 58281
   (W.D. Tex. June 11, 2010)..................................................................................29

*In re Delphi Corp. Sec., Deriv. & ERISA Litig.*,
   248 F.R.D. 483 (E.D. Mich. 2008) ........................................................................29

*Doft & Co. v. Travelocity.com Inc.*,
   C.A. No. 19734, 2004 Del. Ch. LEXIS 75 (Del. Ch. May 21, 2004)................................ 15-16

*Dow Jones & Co. v. Shields*,
   No. 184, 1991, 1992 Del. Ch. LEXIS 24 (Del. Ch. Jan. 10, 1992) ..........................................25

*In re El Paso Corp. S'holders Litig.*,
   41 A.3d 432 (Del. Ch. 2012)................................................................................12

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
   630 F. Supp. 482 (E.D. Pa. 1985) ........................................................................19

*In re FLS Holdings, Inc. S'holders Litig.*,
   No. 12623, 1993 Del. Ch. LEXIS 57 (Del. Ch. Apr. 2, 1993)................................26

*Fountain v. Avondale Indus.*,
   No. 95-1198, 1996 U.S. Dist. LEXIS 5045 (E.D. La. Apr. 18, 1996)..............................25, 26

*Garza v. Sporting Goods Props.*,
   No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009 (W.D. Tex. Feb. 6, 1996) .............5, 6, 10

*Gilbert v. MPM Enters., Inc.*,
   709 A.2d 663 (Del. Ch. 1997)................................................................................8

*Gilmartin v. Adobe Res. Corp.*,
   No. 12467, 1992 Del. Ch. LEXIS 80 (Del. Ch. Apr. 6, 1992)................................8

*Hamilton v. First Am. Title Ins. Co.*,
   266 F.R.D. 153 (N.D. Tex. 2010) ........................................................................21

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)................................................................................23, 24, 25, 27

iv

*Hintmann v. Fred Weber, Inc.*,
  No. 12839, 1998 WL 83052 (Del. Ch. Feb. 17, 1998) ............................................................16

*Hollis v. Hill*,
  232 F.3d 460 (5th Cir. 2000) ....................................................................................................8

*IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.*,
  No. 10 CH 31612, slip op. (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011)......................................27

*In re Ikon Office Solutions*,
  194 F.R.D. 166 (E.D. Penn. 2000)...........................................................................................25

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996) ....................................................................................................8

*Jinks v. Mays*,
  464 F.2d 1223 (5th Cir. 1972) .................................................................................................24

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
  C.A. No. 758-CC, 2009 Del. Ch. LEXIS 174 (Del. Ch. Oct. 2, 2009)...................................19

*Johnson v. Ga. Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ...................................................................................................30

*Kahn v. Sullivan*,
  594 A.2d 48 (Del. 1991) .............................................................................................................8

*Lazy Oil, Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997)..........................................................................................8

*In re Lease Oil Antitrust Litig.*,
  186 F.R.D. 403 (S.D. Tex. 1999)..............................................................................................10

*Lightbourn v. Cnty. of El Paso*,
  118 F.3d 421 (5th Cir. 1997) ...................................................................................................20

*Lohocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004)..............................................................................................21

*Major v. Treen*,
  700 F. Supp. 1422 (E.D. La. 1988)...........................................................................................28

*Manchaca v. Chater*,
  927 F. Supp. 962 (E.D. Tex. 1996)...........................................................................................10

*McKittrick v. Gardner*,
  378 F.2d 872 (4th Cir. 1967) ...................................................................................................30

*McNary v. Am. Sav. & Loan Ass'n*,
  76 F.R.D. 644 (N.D. Tex. 1977) ........................................................................6

*In re MetroCorp Bancshares S'holders Litig.*,
  No. 4:13-cv-03198 (S.D. Tex. 2013) ...............................................................26

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970)..........................................................................................25

*Milstein v. Huck*,
  600 F. Supp. 254 (E.D.N.Y. 1984) ...................................................................8

*Mullen v. Treasure Chest Casino LLC*,
  186 F.3d 620 (5th Cir. 1999) ...........................................................................20

*Murillo v. Tex. A&M Univ. Sys.*,
  921 F. Supp. 443 (S.D. Tex. 1996) ...................................................................6

*In re Nationwide Fin. Servs. Litig.*,
  No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 136962
  (S.D. Ohio Aug. 18, 2009)................................................................................23

*Neal v. Ala. By-Products Corp.*,
  No. 8282, 1990 Del. Ch. LEXIS 127 (Del. Ch. Aug. 1, 1990)..............................15

*In re Netsmart Techs., Inc. S'holders Litig.*,
  924 A.2d 171 (Del. Ch. 2007)...............................................................13, 17

*Nichting v. DPL, Inc.*,
  No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012) .......................................................26

*PaineWebber R & D Partners II, L.P. v. Centocor, Inc.*,
  No. 14405, 2000 Del. Ch. LEXIS 12 (Del. Ch. Jan. 31, 2000) ...............................24

*Paramount Commc'ns, Inc. v. QVC Network, Inc.*,
  637 A.2d 34 (Del. 1994) ...................................................................................11

*Parker v. Anderson*,
  667 F.2d 1204, 1209 (5th Cir. 1982) ...................................................................7

*Pa. v. Del. Valley Citizens' Council for Clean Air*,
  478 U.S. 546 (1986).........................................................................................28

*Philips v. Texas Indus., Inc.*,
  No. 3:14-cv-00740-B (N.D. Tex. 2014) ...............................................................26

*Plumbers Local #65 Pension Fund v. Nicor Inc.*,
   No. 10-CH-52627, slip op. (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011).........................................27

*In re PNB Holding Co. S'holders Litig.*,
   No. Civ. A. 28-N, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006) ............................17,18

*Pompano Beach Police & Firefighters' Ret. Sys. v. Odyssey Healthcare, Inc.*,
   No. CC-10-03561-E, slip op. (Dallas Cnty. Tex. May 18, 2012)...........................................26

*Powell v. Comm'r of Internal Revenue*,
   891 F.2d 1167 (5th Cir. 1990) ...............................................................................................28

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
   No. 888, 1994 U.S. Dist. LEXIS 6621 (E.D. La. May 18, 1994)...........................................30

*Purdie v. Ace Cash Express, Inc.*,
   No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547
   (N.D. Tex. Dec. 11, 2003) ........................................................................................................7

*In re Pure Res., Inc., S'holders Litig.*,
   808 A2d 421 (Del. Ch. 2002).................................................................................................13

*Quintanilla v. A & R Demolition Inc.*,
   No. H-04-1965, 2008 U.S. Dist. LEXIS 37449 (S.D. Tex. May 7, 2008)..............................19

*Ranger Ins. Co. v. Algie*,
   482 F.2d 861 (5th Cir. 1973) .................................................................................................24

*Reed v. Gen. Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983) .........................................................................................5, 7, 10

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. 1992)...........................................................................................28

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,
   506 A.2d 173 (Del. 1986) ......................................................................................................11

*Rodriguez v. Countrywide Home Loans, Inc.*,
   695 F.3d 360 (5th Cir. 2012) .................................................................................................22

*Salinas v. Roadway Express, Inc.*,
   802 F.2d 787 (5th Cir. 1986) ...................................................................................................7

*Spencer v. Comserv Corp.*,
   No. 4-84-794, 1986 U.S. Dist. LEXIS 15863 (D. Minn. Dec. 30, 1986) ..............................28

*In re Staples, Inc. S'holders Litig.*,
   792 A.2d 934 (Del. Ch. 2001)...................................................................................9, 17, 26

*Stein v. Pactiv Corp.*,
No. 10-CH-35455, slip op. (Cook Cnty. Ill. Cir. Ct. Apr. 26, 2011)......................................27

*Stott v. Capital Fin. Servs.*,
277 F.R.D. 316 (N.D. Tex. 2011) .........................................................................................20

*Sugarland Indus. v. Thomas*,
420 A.2d 142 (Del. 1980) ....................................................................................................24

*In re Talley Indus., Inc. S'holders Litig.*,
No. 15961, 1998 Del. Ch. LEXIS 53 (Del. Ch. Apr. 13, 1998).............................................26

*Turberg v. ArcSight*,
No. 5821-VCL (Del. Ch. Sept. 20, 2011) .............................................................................17

*Unger v. Amedisys, Inc.*,
401 F.3d 316 (5th Cir. 2005) ...............................................................................................21

*United States v. Tex. Educ. Agency*,
679 F.2d 1104 (5th Cir. 1982) ...............................................................................................6

*United Vanguard Fund v. TakeCare, Inc.*,
693 A.2d 1076 (Del. 1997) ..................................................................................................24

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
396 F.3d 96 (2d. Cir. 2005)            …………………………………………………………19

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ........................................................................................................22

*Weeks v. S. Bell Tel. & Tel. Co.*,
467 F.2d 95 (5th Cir. 1972) .................................................................................................24

*In re Wm. Wrigley Jr. Co. S'holders Litig.*,
No. 3750-VCL, 2009 Del. Ch. LEXIS 12 (Del. Ch. Jan. 22, 2009) .......................................12

*Young v. Katz*,
447 F.2d 431, 433 (5th Cir. 1971 ...........................................................................................5

## Rules

Tex. Disciplinary R. Prof'l Conduct Rule 1.04(b)..................................................................24

Tex. Disciplinary R. Prof'l Conduct Rule 1.04(b)(5)-(6) ........................................................24

Federal Rules of Civil Procedure Rule 23(a) ...................................................................20, 22

Federal Rules of Civil Procedure Rule 23 (a)(2) ...................................................................20

Federal Rules of Civil Procedure Rule 23(b)(1) ............................................................22

Federal Rules of Civil Procedure Rule 23(b)(2) ............................................................22

**Other Authorities**

4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002).........6

Damodaran, Aswath. *Damodaran on Valuation*. 2d ed.
  Hoboken, NJ: John Wiley & Sons, 2006. p. 10………………………………………...15

*National Law Journal* 2015 Billing Survey .................................................................27

*Investor's Business Daily* ............................................................................................2

Pratt, Shannon P. *The Market Approach to Valuing Businesses.*
  2ed Hoboken, NJ:  John Wiley & Sons, Inc., 2005................................................14

Rosenbaum, Joshua and Joshua Pearl. *Investment Banking: Valuation, Leveraged
  Buyouts, and Mergers & Acquisitions.* 2d ............................................................15

Wells Fargo's *Selected Precedent Transactions Analysis* ...........................................14

Plaintiffs David Eykyn, Mike Eykyn, and Christopher Coffman ("Plaintiffs"), who at all relevant times were shareholders of Multimedia Games Holding Company, Inc. ("MGAM"), respectfully submit this memorandum in support of Plaintiffs' application for: (i) final approval of the April 7, 2015 stipulation of settlement ("Stipulation" or "Settlement")[1] settling these actions (the "Actions")[2]; (ii) final certification of a non-opt-out class (the "Settlement Class") of all record holders and beneficial owners of any share(s) of MGAM at any time beginning on and including September 7, 2014, through and including December 19, 2014;[3] and (iii) an award of reasonable attorneys' fees and expenses not to exceed $310,000 for services rendered by Plaintiffs' Counsel.[4]  For the reasons set forth below, Plaintiffs respectfully request that the Court approve the Settlement including the application for attorneys' fees and expenses.

## I.     INTRODUCTION

As set forth herein and in the accompanying declaration of James M. Wilson, Jr. in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, Certification of the Settlement Class, and An Award of Attorneys' Fees and Expenses ("Wilson Decl."), the Settlement is fair, reasonable, and adequate, and the requested amount of attorneys' fees and expenses is reasonable compensation for the benefits achieved and the work performed on behalf of MGAM shareholders.

---

[1]  Unless expressly provided herein, all capitalized terms shall have the same meaning and/or definitions as set forth in the Stipulation.

[2]  A copy of the Stipulation was attached as Exhibit 1 to the Declaration of Thomas E. Bilek in Support Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative and Class Action Settlement.

[3]  The Class is fully defined in section 1.2 of the Stipulation.

[4]  Faruqi & Faruqi, LLP and Brodsky & Smith, LLC were preliminarily approved as class counsel, and The Bilek Law Firm, LLP was approved as liaison counsel.  *See* Preliminary Approval Order dated April 22, 2015, at ¶ 2 (ECF No. 35).

The Settlement is the product of vigorous adversarial litigation in a compressed period of time and provided valuable benefits to the Settlement Class, which included material disclosures regarding, *inter alia*: (i) critical assumptions made by MGAM's financial advisor Wells Fargo Securities, LLC ("Wells Fargo") in its financial analyses used to render its fairness opinion of the Transaction; and (ii) the process and negotiations between MGAM and GCA leading up to the signing of the Merger Agreement (the "Supplemental Disclosures").  The Settlement was consummated following arm's-length negotiations between highly experienced counsel and represents an excellent resolution of this complex case.[5]

The reaction of the Settlement Class strongly supports that conclusion.  Pursuant to the Preliminary Approval Order, MGAM was directed to mail the Notice of Proposed Settlement of Derivative and Non-Opt Out Class Action ("Notice") to all Persons who held of record MGAM common stock during the class period and to publish a copy of the Summary Notice of Proposed Settlement of Derivative and Non-Opt Out Class Action ("Summary Notice") in *Investor's Business Daily*.[6]  Objections to the Settlement are not due until July 17, 2015 (21 days prior to the Settlement Hearing), but, as of the date of this memorandum, Plaintiffs' counsel are not

---

[5]  The Actions centered around the merger of MGAM with Global Cash Access Holdings, Inc. ("GCA"). Under the terms of the September 8, 2014 Merger Agreement, GCA acquired MGAM for $36.50 in cash for each MGAM share of stock.  Wilson Decl., ¶¶ 2-10.

[6]  Defendants are required under the Preliminary Order to serve and file by July 28, 2015, an Affidavit that the Summary Notice was published and the Notice was mailed as required.  Co-Lead Counsel have conferred with Defense Counsel and understand that the notice distribution requirements in the Preliminary Order have been met.

2

aware of any objections.[7]   Based on these circumstances, the Settling Parties consider the proposed Settlement to be fair, reasonable, and adequate and respectfully request the Court to finally approve the settlement.

## II.   THE LITIGATION AND BACKGROUND TO SETTLEMENT

An overview of the facts of this Action are set forth in the Stipulation and also are summarized in the Wilson Declaration.

Throughout the litigation, Plaintiffs' Counsel conducted a thorough investigation into the facts and law relating to the Action.   For instance, Plaintiffs retained and consulted with a financial expert, reviewed with the expert the Proxy and the Supplemental Disclosures, discovery materials, and relevant public information.   After fully analyzing the merits of all parties' contentions, including the benefits to MGAM shareholders, Plaintiffs and Plaintiffs' Counsel entered into the Stipulation providing for the Settlement described below.   Importantly, during the negotiations, all parties had a clear view of the strengths and weaknesses of their respective claims and defenses, and the Settlement is the product of arm's-length negotiations between the parties, who were all represented by counsel with extensive experience and expertise in shareholder litigation.

In addition, after agreeing to all of the substantive terms of the Settlement, the Parties negotiated Plaintiffs' Counsel's request for fees and expenses.   As a result of these arm's-length

---

[7]  On July 8, 2015, the Court ordered that a note and investment statement received from an MGAM shareholder, George R. Rubin, be filed as part of the record (ECF No. 37).  Mr. Rubin indicated that he had attempted to call Plaintiffs' Counsel regarding the Settlement.  As stated in the Wilson Declaration, there is no record of Mr. Rubin's efforts.  A letter from Faruqi & Faruqi, LLP was sent on July 9, 2015, to Mr. Rubin at the address he gave in his note, providing an overview of the Settlement and a copy of the Stipulation for his review.  Wilson Decl. ¶ 25, Ex. G.

negotiations, Defendants agreed to pay Plaintiffs' Counsel up to $310,000 for all of their fees and expenses, subject to Court approval.[8]

The Settling Parties filed the executed Stipulation with the Court on April 7, 2015. Attached as exhibits to the Stipulation were a copy of a proposed Preliminary Order, a proposed form of Notice, and a proposed Final Judgment.

The Court entered the Preliminary Approval Order on April 22, 2015, which, *inter alia*, preliminarily certified the Settlement Class, preliminarily approved the Stipulation, set the date for the hearing concerning the Settlement Hearing on August 7, 2015, approved the form and method of the Summary Notice and Notice, and directed Defendants to mail the Notice to the Settlement Class.  *See* Wilson Decl. ¶ 24.

## III.    THE SETTLEMENT TERMS

The Settlement required MGAM to disclose certain information to members of the Settlement Class that Lead Plaintiffs believed was material and critical to their ability to make a fully-informed decision regarding whether to vote for, or against, the Merger.  The Supplemental Disclosures, which were set forth in a Form 8-K filed with the SEC on November 21, 2014,[9] provided information to MGAM shareholders in advance of the shareholders' vote concerning (i) critical assumptions made by MGAM's financial advisor, Wells Fargo, in its financial analysis conducted in connection with the preparation and issuance of its fairness opinion, and (ii) the process and negotiations between MGAM and GCA leading up to the signing of the

---

[8]  The award of attorneys' fees and expenses will not impact the equitable relief obtained for the Settlement Class given that MGAM, its successor in interest, and/or its insurers have agreed to bear the full cost of an award of attorneys' fees and expenses up to $310,000.

[9]  *See* Wilson Decl., Ex. A.

Merger Agreement.  The Supplemental Disclosures are summarized in more detail in the Wilson

Declaration at ¶ 13, and examined below in Section IV.

The Stipulation provides that, if the Court approves the Settlement, and in consideration

of the Supplemental Disclosures, Plaintiffs, on behalf of the Settlement Class, agree to release all

claims asserted against Defendants in the Actions or in any action, proceeding, or shareholder

demand involving the facts and circumstances that gave rise to the Actions.

## IV.     THE PROPOSED SETTLEMENT SHOULD BE FINALLY APPROVED

### A.     The Fifth Circuit Favors Settlement of Class Actions and Presumes Fairness of Settlements Negotiated and Supported by Experienced and Competent Counsel

The standard for reviewing a proposed class action settlement is whether the proposed

settlement is "fair, adequate and reasonable," and has been entered into without collusion

between the parties.  *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see also In re*

*Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981); *Ayers v. Thompson*,

358 F.3d 356, 368 (5th Cir. 2004).

When evaluating the fairness of a proposed class settlement, the trial judge "must not try

the case in the settlement hearings because 'the very purpose of the compromise is to avoid the

delay and expense of such a trial.'"  *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir.

1983) (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)).   "[T]here is a strong

presumption in favor of finding the Settlement Agreement fair.  The proposed settlement is not

required to 'achieve some hypothetical standard constructed by imagining every benefit that

might someday be obtained in contested litigation.'   Rather, compromise is the essence of

settlement . . . ."  *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 286 (W.D. Tex. 2007) (quoting

*Garza v. Sporting Goods Props.*, No. SA-93-CA-1082, 1996 U.S. Dist. LEXIS 2009, at *41

(W.D. Tex. Feb. 6, 1996)) (citation omitted).  Thus, a court "generally will consider the facts of a

settlement in a light favorable to promoting settlements."  *McNary v. Am. Sav. & Loan Ass'n*, 76 F.R.D. 644, 648 (N.D. Tex. 1977).[10]

Where experienced counsel have negotiated a settlement at arm's-length, courts accord class counsel's opinion great weight, and presume the compromise is fair and reasonable.  *United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982); *Murillo v. Tex. A&M Univ. Sys.*, 921 F. Supp. 443, 445 (S.D. Tex. 1996) (citing Newberg, *supra* § 11.42).  Thus, the court "is entitled to rely upon the judgment of experienced counsel," and "[i]ndeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."  *Cotton*, 559 F.2d at 1330; *see also DeHoyos*, 240 F.R.D. at 286 (holding that "the Court may rely on the judgment of experienced counsel for the parties" when evaluating a settlement) (citing *Garza*, 1996 U.S. Dist. LEXIS 2009, at *41).

Here, the Settlement was reached by experienced, fully-informed counsel and vigorous arm's-length negotiations.  Thus, the Court should accord significant weight to Plaintiffs' Counsel's support of the Settlement and presume that the Settlement is fair and reasonable.

### B.    The Settlement Is Fair, Reasonable, and Adequate

Once satisfied that counsel adequately represented the class and has bargained for the proposed settlement in good faith, the "'only question' for the Court 'is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  *McNary*, 76 F.R.D. at 649.  The Fifth Circuit considers the following six factors in determining whether to approve a proposed settlement: (i) The existence of fraud or collusion behind the settlement; (ii) The complexity, expense, and likely duration of the litigation; (ii) The stage of the proceedings and

---

[10]  In addition, "there is an overriding public interest in favor of settlement [of class actions]," because such suits "have a well deserved reputation as being most complex."  *Cotton*, 559 F.2d at 1331; *see also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002).

the amount of discovery completed; (iv) The probability of plaintiffs' success on the merits; (v) The range of possible recovery; and (vi) The opinions of class counsel, class representatives, and absent class members. *Reed*, 703 F.2d at 172 (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *see also Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 789 (5th Cir. 1986). The Settlement satisfies these criteria.

### 1.    There Was and Is No Fraud or Collusion in Connection with the Settlement

Courts in this jurisdiction presume that settlement negotiations are free from fraud and collusion, unless affirmative evidence indicates otherwise. *DeHoyos*, 240 F.R.D. at 287; *Purdie v. Ace Cash Express, Inc.*, No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *19 (N.D. Tex. Dec. 11, 2003) (rejecting claim of fraud or collusion because objector pointed to no evidence in record supporting her claim).

The Settlement was reached only after extensive and hard-fought arm's-length negotiations by counsel experienced in complex class actions. There is not, nor has there been any suggestion of, collusion between well-respected Plaintiffs' and Defendants' counsel.

### 2.    The Complexity, Expense, and Likely Duration of this Litigation Supports the Settlement

"'Most class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 U.S. Dist. LEXIS 98763, at *43 (N.D. Ohio Sept. 11, 2011) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)). As a result, "[i]n most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.* (internal quotations omitted). Accordingly, courts have consistently held that "[t]he expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a]

settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984); *Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996) (holding that in determining the "fairness" of class action settlements, district courts will employ a number of factors including an assessment of the likely complexity, length, and expense of the litigation.); *Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 340 (W.D. Pa. 1997) ("'[I]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'").

These considerations are fully applicable here. The Amended Complaint challenged the offer price for the Company's shares as well as the adequacy of disclosures in the Proxy. However, valuation issues frequently become a battle of experts and courts are often skeptical regarding competing expert testimony. *See, e.g.*, *Gilbert v. MPM Enters., Inc.*, 709 A.2d 663, 673 (Del. Ch. 1997); *In re Appraisal of Shell Oil Co.*, No. 8080, 1990 Del. Ch. LEXIS 199 (Del. Ch. Dec. 11, 1990), *aff'd*, 607 A.2d 1213 (Del. 1992); *Kahn v. Sullivan*, 594 A.2d 48, 62 (Del. 1991).[11] The Actions present these (and other) complex issues, which after trial, would likely be followed by an appeal. Consequently, significant legal and financial resources would be expended in that effort. The Settlement that required the dissemination of the Supplemental Disclosures prior to the vote on the Transaction obviates the need to litigate any of these issues and the concomitant expense. Thus, this factor supports approval of the Settlement.

Where there are material deficiencies in disclosure documents seeking shareholder approval, courts have held that the preferred remedy is disclosure before the merger. *See, e.g.*, *Gilmartin v. Adobe Res. Corp.*, No. 12467, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992) (granting plaintiff's motion for a preliminary injunction and holding "[t]he right to cast an

---

[11] Texas federal courts have recognized that "Delaware courts are often influential in matters of corporate law . . . ." *See Hollis v. Hill*, 232 F.3d 460, 469 (5th Cir. 2000).

informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages");

> [O]ur cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.  An injunctive remedy of that nature specifically vindicates the stockholder right at issue—the right to receive fair disclosure of the material facts necessary to cast a fully informed vote—in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del. Ch. 2001).

In this case, Plaintiffs ensured that MGAM shareholders received the Supplemental Disclosures in advance of the vote on the Merger, thereby providing MGAM shareholders with the material information and permitting them to make an informed decision before casting their votes on the Merger.

### 3.    The Stage of Proceedings and the Amount of Discovery Completed Weighs in Favor of Settlement

Plaintiffs' Counsel obtained on an expedited basis[12] and thoroughly reviewed substantial documentation, including MGAM Board minutes and presentations to the MGAM Board by Wells Fargo.  Plaintiffs' Counsel also conferred with a finance and valuation expert concerning the issues in the Actions, particularly damages and other available relief.  Plaintiffs' Counsel also reviewed additional non-public documents produced by Defendants and conducted the depositions of MGAM Director and Chief Executive Officer Patrick J. Ramsey and James Ruggle from Wells Fargo Securities, LLC, financial advisors to MGAM for the Merger (documents and depositions together, the "Confirmatory Discovery").

---

[12]  Plaintiffs' Counsel were prepared to seek expedited discovery through motion practice with the Court but were able to negotiate the disclosure of critical information.

Further ensuring that settlement negotiations were extensive and adversarial, Plaintiffs' Counsel and Defendants' counsel exchanged proposals and counter-proposals concerning the nature and scope of the Supplemental Disclosures.  Ultimately, Defendants agreed to provide MGAM shareholders with more specific information that addressed many of the issues raised by Lead Plaintiffs in the Amended Complaint.

Plaintiffs' Counsel thus determined that the Settlement was fair, reasonable, and adequate only after reviewing public and private documents, as well as considering the testimony of the confirmatory depositions.  Therefore, the parties reached an agreement to settle with a "full understanding of the legal and factual issues surrounding this case." *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996).  This factor therefore supports approval of the Settlement.

> **4.     The Probability of Success on the Merits and the Possible Range of Recovery Supports the Settlement**

In analyzing the factors of probability of success on the merits, possible range of recovery, and certainty of damages, the court is guided by two principles: "'The Settlement terms should be compared with the likely rewards the class would have received following a successful trial' and 'the strength of the case for plaintiffs must be balanced against the amount offered in settlement.'" *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 433 (S.D. Tex. 1999).  "However, the court is not to decide the issues or try the case via the fairness hearing because, 'the very purpose of the compromise is to avoid the delay and expense of such a trial.'" *Garza*, 1996 U.S. Dist. LEXIS 2009, at *49 (citing *Reed*, 703 F.2d at 172).

> **a.     The Damages Claim**

While Plaintiffs believe their claims were meritorious when filed, through investigation, discovery, and consultation with their valuation expert, Plaintiffs and Plaintiffs' Counsel concluded that, except for the disclosure claims, their chances of success on the other claims

relating to monetary damages would have been an uphill battle under the particular circumstances and controlling case law.[13]

Apart from the disclosure claims, Plaintiffs alleged that the Individual Defendants (i.e., the MGAM board members) (and MGAM and GCA aiding and abetting thereof) breached their fiduciary duties because they failed to obtain a fair and adequate price for MGAM shareholders. *See, e.g.*, *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994) (when a company is up for sale, directors are obligated "to seek the transaction offering the best value reasonably available to the shareholders"); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986) ("The directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company.").

Plaintiffs would have argued that: (i) MGAM had a solid balance sheet with $3.00 a share in net cash; (ii) certain Wall Street analysts set target prices for MGAM as high as $40.00-$45.00 a share, between 10%-20+% above the price offered; (iii) as opposed to other gaming companies, MGAM's revenue and profits were exceeding expectations quarter after quarter; (iv) the members of the Board did not conduct an adequate process; and (v) MGAM and GCA aided and abetted the Individual Defendants' breaches of fiduciary duty.

Defendants would have likely countered that the Board used their business judgment to sell the Company because the Merger had various advantageous aspects that were in the best interests of MGAM shareholders.  Defendants would have argued that the $36.50 per share offer represented a 31% premium to the stock's September 5, 2014 close and that there was an active bidding process which resulted in a price per share that was an increase of $4.25 from the bottom

---

[13]  Wilson Decl., ¶¶ 16, 19.

of the price range and an increase of $1.00 from the top of the price range per share initially offered by GCA.

Whether or not the Merger consideration sufficiently valued MGAM was likewise a complex matter and there was substantial evidentiary support for Defendants' argument that the Board's decision to accept GCA's offer was fully defensible under the business judgment rule. In any event, based on the extensive public and confidential financial information produced, Plaintiffs' valuation expert determined he would have had difficulty demonstrating that the Merger consideration fell outside the range of fairness.  Thus, even if Plaintiffs were able to persuade the Court that there was some deficiency in the process that produced the Merger Agreement, Plaintiffs could not realistically expect to recover a monetary judgment in favor of the Class.  *See In re Wm. Wrigley Jr. Co. S'holders Litig.*, No. 3750-VCL, 2009 Del. Ch. LEXIS 12, at *18-23 (Del. Ch. Jan. 22, 2009) (approving a disclosure settlement as fair and reasonable despite the absence of a monetary benefit when the challenged transaction appeared to be fully and fairly priced).  Moreover, no rival bidder emerged at the time of the Settlement, making the prospect of securing an injunction (on grounds other than disclosure) slim.  *See, e.g.*, *In re El Paso Corp. S'holders Litig.*, 41 A.3d 432, 449-52 (Del. Ch. 2012).

**b.      The Disclosure Claims**

Vigorous and arm's-length negotiations between counsel for the parties produced additional material disclosures ahead of the Merger, which ensured that MGAM shareholders were able to make an informed decision on whether to vote for the Merger and which substantially resolved the disclosure contentions Plaintiffs alleged in the Amended Complaint and settlement demand letters.

i.      **Material Information Regarding Wells Fargo's Financial Analyses**

Plaintiffs obtained through the Supplemental Disclosures material information regarding Wells Fargo's financial analyses on MGAM and GCA.  *See supra* Section III.  Crucially, these financial analyses supported Wells Fargo's fairness opinion. Wells Fargo's fairness opinion was perhaps the most critical factor that shareholders would consider when deciding whether to vote in favor of the Merger.  As the Court of Chancery has previously recognized:

> [W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the [] board as to how to vote . . . rely.'

*In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 202 (Del. Ch. 2007).  Thus, it is axiomatic that key inputs and assumptions Wells Fargo used in its analyses are material and should be disclosed to MGAM shareholders.  *See, e.g., In re Pure Res., Inc., S'holders Litig.*, 808 A2d 421, 449 (Del. Ch. 2002) (finding that stockholders are entitled to a "fair summary" of the investment bankers' work).

**Selected Public Companies and Precedent Transactions Analyses**

A *Selected Public Companies Analysis* is often referred to as a "market approach" to valuation.  A market approach is a comparative valuation exercise because it relies on analyzing the values ascribed by the market to the peers of the subject company, normalizing those values to account for one-time or other items, and then applying the resulting multiples to value the subject company.  In this sense, the subject company is "compared" to the market for similar companies.  "The theory of the market approach to valuation is the economic principle of substitution:  One would not pay more than one would have to pay for an equally desirable

alternative."[14]   Consequently, in such an analysis, *comparability* and *relative* operating performance between the subject company and the selected comparables are of predominant importance.  Put another way, the goal of this valuation technique is to isolate and normalize for factors that may make certain comparable companies relatively superior or inferior to the subject company, so that the resulting values reflect the equivalent to the subject, and not something better or worse.

With this in mind, it was material to MGAM shareholders' ability to actually assess *comparability* and *relative* operating performance and to have the specific company by company metrics for the three (3) companies utilized in the analysis (as opposed to only the mean/median provided in the Definitive Proxy).  Similarly, it was beneficial for MGAM shareholders to receive the specific company by company metrics for the three (3) selected companies that Wells Fargo indicated were reviewed for "reference purposes only" in the Definitive Proxy.  These companies were addressed in Wells Fargo's fairness presentation to the Board but had been excluded from the Definitive Proxy.

Similarly, with respect to Wells Fargo's *Selected Precedent Transactions Analysis* similar dynamics apply with regard to 1) observing valuation multiples of "comparable" target companies in transactions, 2) normalizing comparative financial metrics, and 3) applying appropriate transaction multiples to the normalized financial metric.  However, in a *Selected Precedent Transactions Analysis*, the selected comparable data set typically consists of purchases of business entities rather than public market trades of smaller, fractional interests.  Consequently, the comparability of the subject transaction to the data set of selected comparable

---

[14]  Pratt, Shannon P. *The Market Approach to Valuing Businesses.* 2d ed.  Hoboken, NJ:  John Wiley & Sons, Inc., 2005.  p. xxxii.

transactions is key to understanding the resulting value conclusions.   In this case, MGAM shareholders were not provided with any information regarding the observed multiples from the set of comparable transactions as part of the Definitive Proxy and, therefore, had no basis against which to evaluate the ranges of multiples selected and applied by Wells Fargo or the resulting indications of value.   As part of the settlement, MGAM disclosed the specific transaction by transaction metrics for each deal analyzed.

### Discounted Cash Flow Analysis

In general, a discounted cash flow ("DCF") analysis is an important part of the valuation process.   A DCF value represents the present value of the forecasted cash flow stream of the subject entity.   A DCF analysis is widely used by financial professionals and is based on the premise that "the value of an asset is the present value of the expected cash flow on the asset, discounted back at a rate that reflects the riskiness of these cash flows."[15]   Moreover, the DCF serves as an important alternative to market-based valuation techniques such as comparable companies and precedent transactions, which can be distorted by a number of factors, including market aberrations (e.g., the post-subprime credit crunch)."[16] In fact, of the various valuation exercises conducted by the financial advisor, the discounted cash flow ("DCF") analysis, which is based upon the premise that the value of a company is equal to the present value of its future cash flows, is "considered by experts to be the preeminent valuation methodology."   *Neal v. Ala. By-Products Corp.*, No. 8282, 1990 Del. Ch. LEXIS 127, at *20 (Del. Ch. Aug. 1, 1990).   This is because "[t]he goal of the DCF method of valuation is to value future cash flows."   *Doft & Co. v.*

---

[15]   Damodaran, Aswath. *Damodaran on Valuation*.   2d ed.   Hoboken, NJ: John Wiley & Sons, 2006. p. 10.

[16]   Rosenbaum, Joshua and Joshua Pearl.   *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*.   2d ed.   Hoboken, NJ:   John Wiley & Sons, Inc., 2013. p. 125.

*Travelocity.com Inc.,* C.A. No. 19734, 2004 Del. Ch. LEXIS 75, at *32 (Del. Ch. May 21, 2004).

But a DCF analysis is "only as good as the inputs to the model." *Id.* at *21.

Here, with respect to Wells Fargo's Discounted Cash Flow Analysis, MGAM disclosed MGAM's actual 12.43% weighted average cost of capital ("WACC"), which was not provided in the Definitive Proxy.  Further, MGAM disclosed the range of perpetuity growth rates, range of terminal values and range of implied enterprise values derived from the analysis.  Additionally, as opposed to simply indicating in the Definitive Proxy that the implied equity values in the analysis derived from a "range of terminal value EBITDA multiples," MGAM specifically provided in the Supplemental Disclosures the enterprise value range and equity value range for MGAM and resulting implied share price range for terminal value EBITDA multiple of 7.5x. This information was material because understanding the context behind the indicated value conclusions, *i.e.* the inputs and assumptions used, is of particular importance, as the analysis itself provides a different valuation perspective from the market-based analyses described below in the selected companies and selected transactions analyses.  In *Hintmann v. Fred Weber, Inc.,* No. 12839, 1998 WL 83052, at *13 (Del. Ch. Feb. 17, 1998), the Court found "[g]iven the dearth of information he provided, however, I cannot assess the quality of Buettell's assumptions and cannot accept his suggested discount rate."

The above undisclosed inputs and assumptions Wells Fargo used in its analyses are important because Wells Fargo used them as the basis of its analyses.  *See David P. Simonetti Rollover IRA v. Margolis*, C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78, at *30 (Del. Ch. June 27, 2008)  ("The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized.  A proxy statement should 'give the stockholders the best estimate of the

16

company's future cash flows as of the time the board approved the [transaction].'") (quoting *Netsmart*, 924 A.2d at 203); Transcript of Settlement Hearing at 43:8-15, *Turberg v. ArcSight*, No. 5821-VCL (Del. Ch. Sept. 20, 2011) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there . . . [Y]ou would never see a board book that would go to the board without the background multiples.").[17]

### Projections

Management-generated financial projections "are probably among the most highly-prized disclosures by investors." *Netsmart*, 924 A.2d at 203. This is because, while "[i]nvestors can come up with their own estimates of discount rates or… market multiples," unfortunately "[w]hat they cannot hope to do is replicate management's inside view of the company's prospects." *Id.* As such, "[a] proxy statement should 'give the stockholders the best estimate of the company's future cash flows as of the time the board approved the [transaction].'" *Simonetti*, 2008 Del. Ch. LEXIS 78, at *30 (quoting *Netsmart*, 924 A.2d at 203). Indeed, " the projections are the information that most stockholders would find the most useful to them." *Staples*, 792 A.2d at 958 n.44.

Here, with respect to the Projections provided by MGAM to its shareholders, the Supplemental Disclosures provide a table setting forth the projected after-tax unlevered free cash flows for the Company, as well as the line items used to derive the unlevered free cash flows. Any reasonable shareholder, when faced with the question of whether to accept a transaction in exchange for an interest in Oneida as a stand-alone entity, would consider the entirety of management's various projections for how the company would perform in an independent capacity important in deciding to vote on the Proposed Transaction. *See In re PNB Holding Co.*

---

[17] *See* Compendium of Unreported Opinions and Exhibits ("Compendium"), Tab A.

*S'holders Litig.*, No. Civ. A. 28-N, 2006 Del. Ch. LEXIS 158, at *58 (Del. Ch. Aug. 18, 2006) ("In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate.  After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company.").

In sum, the Supplemental Disclosures provided material information that was missing from the disclosure of MGAM's advisor's fairness analyses.  This information was necessary for shareholders to receive a fair summary of the advisors' work and to understand the basis of their various analyses.  Without disclosure of this information, the advisors' analyses were materially misleading and incomplete.

ii.      **Disclosure of Compensation Paid to Wells Fargo Potential Conflict of Interest**

The Supplemental Disclosures also provided shareholders with additional information with respect to information relating to potential conflicts of interest in the financial analysis as to the fairness of the Transaction regarding the fees due to Wells Fargo for rendering its fairness opinion.  Specifically, MGAM disclosed the breakdown between the fixed and significant contingent portion of its fee arrangement with its banker, including the fact that $7.4 million was contingent on consummation of the deal, as well as the fees earned by Wells Fargo from MGAM for the two year period ending September 8, 2014.  Clearly, it was material to the Company's shareholders to know that the banker hand-picked by the Board to issue a fairness opinion on the Merger would not receive $7.4 million of its fee if the deal was not consummated.

Generally, such disclosures are important because shareholders are entitled to understand whether any potential conflicts of interest exist – not only with the Company's managers and directors, but also with the financial advisors that influence the actions taken by those managers

and directors on behalf of shareholders.  Courts have "stressed the importance of disclosure of potential conflicts of interest of financial advisors."  *In re John Q. Hammons Hotels Inc. S'holder Litig.*, C.A. No. 758-CC, 2009 Del. Ch. LEXIS 174, at *55 (Del. Ch. Oct. 2, 2009). The Delaware Court of Chancery has recognized that shareholders must be informed of factors that may influence financial advisor's analytical efforts. *See David P. Simonetti Rollover IRA v. Margolis,* 2008 Del. Ch. LEXIS 78, at *25 (Del. Ch. June 27, 2008).  The information provided to MGAM shareholders allowed them to determine whether any potential conflict existed and what weight to place upon Wells Fargo's fairness opinion.

### 5.    The Opinion of Plaintiffs' Counsel and Settlement Class Members

It is well settled that the reaction of the Class to the Settlement is perhaps the most significant factor to be weighed in considering its adequacy.  *See Quintanilla v. A & R Demolition Inc.*, No. H-04-1965, 2008 U.S. Dist. LEXIS 37449, at *15 (S.D. Tex. May 7, 2008) ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement'") (quoting *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 118 (2d. Cir. 2005)).

In this case, after receiving notice of the Settlement, not one Class member has objected to the Settlement as of the time that Plaintiffs' Counsel filed this Motion.  Accordingly, the lack of objection from Settlement Class members—or even hint of displeasure from the Settlement Class—weighs heavily in favor of approving the Settlement.

Additionally, the view of Plaintiffs' Counsel, while not conclusive, is "entitled to significant weight."  *Fisher Bros. v. Cambridge-Lee Indus., Inc*., 630 F. Supp. 482, 488 (E.D. Pa. 1985); *Ahearn v. Fibreboard Corp*., 162 F.R.D. 505, 528 (N.D. Tex. 1995).  Plaintiffs' Counsel believe that the Settlement is fair, reasonable, and adequate.

**V.      THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(a)**

**A.      The Numerosity Requirement Is Satisfied**

The class is so numerous that joinder of all members is impracticable.  According to the Company's SEC filing, as of November 3, 2014, approximately 29.7 million shares were outstanding.  *See Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding a class of 100 to 150 members satisfies numerosity and any more than 40 members should raise a presumption that joinder is impracticable).  In addition, the Settlement Class is too geographically dispersed to be easily joined into one action.  *See Stott v. Capital Fin. Servs.*, *Inc*., 277 F.R.D. 316, 324 (N.D. Tex. 2011).  Because there are hundreds if not thousands of MGAM shareholders dispersed throughout the United States, the proposed Settlement Class satisfies the numerosity requirement.

**B.      The Commonality Requirement Is Satisfied**

The commonality requirement under Rule 23 (a)(2) is met where, as here, "there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."  *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).  Here, issues common to the Settlement Class include, *inter alia*, (i) whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, candor, or due care with respect to Plaintiffs and the other members of the Settlement Class in connection with the Merger and (ii) whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably possible under the circumstances for the benefit of Plaintiffs and the other Settlement Class members in connection with the Merger.  As these claims affect the entirety of the Settlement Class equally, the proposed Settlement Class meets the commonality requirement.

### C.     The Typicality Requirement Is Satisfied

The typicality requirement is satisfied because Plaintiffs' claims arise from a similar course of conduct and assert the same legal theories as the claims of all Settlement Class members.  *See Lohocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004) (typicality is found where claims raised by plaintiffs have "a common source and rest upon the same legal and remedial theories" and "[f]actual differences will not defeat typicality").  Here, the typicality requirement is satisfied where the claims arise from the same nucleus of operative facts, i.e., the Merger between MGAM and GCA.

### D.     The Adequacy Requirement Is Satisfied

The adequacy requirement is met where, as here, "(1) the named plaintiffs' counsel [prosecuted] the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members."  *Hamilton v. First Am. Title Ins. Co.*, 266 F.R.D. 153, 163-64 (N.D. Tex. 2010); *see also Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("[C]lass representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members.").

Plaintiffs and their counsel have fairly and adequately represented and protected the interests of all Settlement Class members, as demonstrated by the record showing vigorous prosecution of this litigation.  Plaintiffs' Counsel is well qualified to litigate on behalf of the proposed Settlement Class as they have litigated numerous shareholder class actions throughout

the country, including in this jurisdiction.[18]   Thus, Lead Plaintiffs and Co-Lead Counsel satisfy

the adequacy requirement.

### E.       The Proposed Settlement Satisfies Rule 23(b)

In addition to meeting all of the requirements of Rule 23(a), the proposed Settlement

Class also satisfies both Rule 23(b)(1) and (b)(2).  Rule 23(b)(1) authorizes class certification if:

> (1) prosecuting separate actions by or against individual members would create the risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).  Rule 23(b)(2) authorizes class certification if "the party opposing the

class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  Fed. R. Civ. P. 23(b)(2); *Rodriguez v. Countrywide Home Loans, Inc.*, 695 F.3d 360,

365 (5th Cir. 2012).  A class certified under Rule 23(b)(1) or (b)(2) is mandatory and members

of the settlement class *may not* opt out.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

2558 (2011).

Because all Settlement Class members are shareholders of the Company challenging the

same Merger between MGAM and GCA, there is a substantial risk of varying or inconsistent

results had there been multiple actions concerning the Merger.  For example, one court may have

permitted consummation of the Merger, while another court may have enjoined the vote pending

---

[18]  *See* Wilson Decl, Exs. B-E.

additional steps by the Board.  *See, e.g.*, *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG (SSx), 2013 U.S. Dist. LEXIS 155091, at *18 (C.D. Cal. Oct. 25, 2013) ("It would be inefficient to have individual members of the Class—who are likely geographically dispersed, given that CIL was a publicly-traded company—bring separate claims in scattered courts across the country.  Such fragmentation would . . . create a risk of inconsistent judgments."); *see also In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 136962, at *29-30 (S.D. Ohio Aug. 18, 2009) ("Here, absent class certification, the various Shareholder Actions filed against the Defendants could result in inconsistent judgments, e.g., regarding whether the transaction should or should not proceed.").

Defendants are also alleged to have acted on grounds that are generally applicable to the proposed Settlement Class members in that the Merger affects all MGAM shareholders similarly. In other words, the relief obtained—dissemination of the Supplemental Disclosures—benefitted all members of the Settlement Class equally.  By providing this material information to shareholders prior to the stockholder vote, all MGAM shareholders were able to make an informed decision whether to vote for, or against, the Merger.

## VI.    THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR REASONABLE ATTORNEYS' FEES AND EXPENSES

As provided in the Stipulation (¶ 3.1) Defendants acknowledge that this Action and Plaintiffs' Counsel efforts were the reason and cause for the Supplemental Disclosures and have agreed to pay up to $310,000.  The Supreme Court has encouraged this type of consensual resolution of attorneys' fee as the ideal toward which litigants should strive.  For instance, in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court noted that a "request for attorney's fees should not result in a second major litigation.  *Ideally, of course, litigants will*

*settle the amount of a fee*." *Id.* at 437 (emphasis added); *see also Ayers v. Thompson*, 358 F.3d 356, 375 (5th Cir. 2004) (same).

It is well settled that the determination of reasonable attorneys' fees is left to the sound discretion of the district court. *See Ranger Ins. Co. v. Algie*, 482 F.2d 861, 864 (5th Cir. 1973) (citing *Weeks v. S. Bell Tel. & Tel. Co.*, 467 F.2d 95, 97 (5th Cir. 1972)); *Jinks v. Mays*, 464 F.2d 1223, 1228 (5th Cir. 1972); *Culpepper v. Reynolds Metals Co.*, 442 F.2d 1078, 1081 (5th Cir. 1971)).

In determining the amount of an award of attorneys' fees, courts consider the following factors: (a) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (b) the time limitations imposed by the client or by the circumstances; (c) the fee customarily charged in the locality for similar legal services; (d) the results obtained; (e) the experience, reputation, and ability of the lawyer or lawyers performing the services; (f) whether the fee is fixed or contingent; and (g) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.   Tex. Disciplinary R. Prof'l Conduct Rule 1.04(b)[19]; *see also Sugarland Indus. v. Thomas*, 420 A.2d 142, 152 (Del. 1980); *United Vanguard Fund v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997); *PaineWebber R & D Partners II, L.P. v. Centocor, Inc.*, No. 14405, 2000 Del. Ch. LEXIS 12, at *10 (Del. Ch. Jan. 31, 2000).   Courts may also consider counsel fee awards in similar cases in determining the amount to be awarded. *See Dow Jones & Co. v. Shields*, No. 184, 1991, 1992 Del. Ch. LEXIS 24, at *3 (Del. Ch. Jan. 10, 1992).

---

[19] Rule 1.04(b) also looks to the personal relationship with the client. *See* Rule 1.04(b)(5)-(6).  The length of the professional relationship with the client is inapplicable to the instant analysis because Plaintiffs served in a representative capacity on behalf of the proposed Settlement Class.

Plaintiffs' Counsel respectfully submit that their request is fair and reasonable in light of the benefits achieved, awards in other similar cases, and other relevant factors.

### A.      Plaintiffs Conferred a Substantial Benefit on MGAM Shareholders

The result achieved is an important factor to be considered in assessing the propriety of an attorneys' fee award.  *Hensley*, 461 U.S. at 436 (considering the "most critical factor is the degree of success obtained"); *In re Ikon Office Solutions*, 194 F.R.D. 166, 194 (E.D. Penn. 2000) (citation omitted).  Courts have long permitted counsel who creates a benefit for others to recover their expenses, including reasonable attorneys' fees, from those who enjoy the benefit conferred.  *See Boeing Co. v. Van Gernert*, 444 U.S. 472, 478 (1980).  The substantial benefit doctrine is applicable in a class action context even when there is no ascertainable fund from which attorneys' fees can be paid, but the litigation has indirectly conferred substantial monetary or non-monetary benefit on an ascertainable group and the court has jurisdiction over both the subject matter of the lawsuit and the defendant.  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Fountain v. Avondale Indus.*, *Inc*., No. 95-1198, 1996 U.S. Dist. LEXIS 5045 at *3 (E.D. La. Apr. 18, 1996) (concluding that "[g]uaranteeing the shareholder's right to accurate information in proxy statements is exactly the sort of corporate therapeutics" that warrants the award of attorneys' fees).

Here, after Plaintiffs initiated the Actions, filed the Amended Complaint, propounded discovery, filed the motions for expedited proceedings and for preliminary injunction, undertook extensive expedited discovery, and engaged in good faith settlement negotiations, Defendants issued Supplemental Disclosures which substantially addressed Plaintiffs' disclosure deficiency allegations.

The Supplemental Disclosures, which were made prior to the shareholder vote on the Merger, permitted MGAM shareholders to exercise their right to informed corporate suffrage by

making a fully-informed decision on the Merger. *Fountain*, 1996 U.S. Dist. LEXIS 5045, at *2 (awarding attorneys' fees and recognizing that a shareholders "right to cast an informed vote, in and of itself is a substantial interest worthy of vindication") (citation omitted).[20]

### B.   Fee Awards in Similar Cases and the Rates Charged in Similar Litigation

Here, the requested fee and expense award is eminently fair and reasonable based on similar shareholder actions from across the country where plaintiffs' counsel conferred non-monetary corporate benefits on behalf of shareholders. *See, e.g.*, *In re MetroCorp Bancshares S'holders Litig.*, No. 4:13-cv-03198 (S.D. Tex. 2013) (awarding fees and expenses of $425,000 for supplemental disclosures and .5% reduction of termination fee) (Compendium, Tab K); *Philips v. Texas Indus., Inc. et al,*  No. 3:14-cv-00740-B (N.D. Tex. 2014) (awarding fees and expenses of $360,000 for supplemental disclosures) (Compendium, Tab L); *Pompano Beach Police & Firefighters' Ret. Sys. v. Odyssey Healthcare, Inc.*, No. CC-10-03561-E, slip op. at 7 (Dallas Cnty. Tex. May 18, 2012) (awarding fees and expenses of $675,000 for additional disclosures) (Compendium Tab B ); *Call4U, Ltd. v. Goodman Global, Inc.*, No. 2007-66888, slip op. at 5 (Harris Cnty. Tex. May 13, 2009) (awarding $890,000 for additional disclosures and amendment to merger agreement) (Compendium Tab C); *Nichting v. DPL, Inc.*, No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012) ($700,000 for disclosure-only settlement) (Compendium Tab D); *Collier v. Brightpoint, Inc.*, C.A. No. 1:12-cv-1016 (TWP)(DKL) (S.D. Ind. May 1, 2013) ($600,000 for disclosure-only settlement) (Compendium, Tab E); *Berens v. Marshall & Isley*

---

[20]   It is also settled under Delaware law that curative disclosures confer a compensable benefit on the class for which class counsel can seek fees and expenses. *See, e.g.*, *In re FLS Holdings, Inc. S'holders Litig.*, No. 12623, 1993 Del. Ch. LEXIS 57, at *16 (Del. Ch. Apr. 2, 1993) ("Improved disclosures may certainly prove beneficial to class members and may constitute consideration of a type which will support a settlement of claims."). *See also In re Talley Indus., Inc. S'holders Litig.*, No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998); *In re Staples*, 792 A.2d at 954.

*Corp.*, et al., No. CV 021273 (Milwaukee Cnty. Cir. Ct. Wis. June 19, 2012) (awarding negotiated fee of $695,000 for additional disclosures contained in a Form 8-K) (Compendium Ex. ); *In re Aeroflex S'holders Litig.*, No. 003943/2007, slip op. Nassau Cnty., N.Y. June 30, 2009) (awarding $850,000 fee for additional disclosures contained in proxy statements) (Compendium, Tab F); *Plumbers Local #65 Pension Fund v. Nicor Inc.*, No. 10-CH-52627, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011) (awarding fees and expenses of $675,000 for additional disclosures) (Compendium, G); *Stein v. Pactiv Corp.*, No. 10-CH-35455, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Apr. 26, 2011) (awarding fees and expenses of $860,000 for additional disclosures) (Compendium, Tab H); *IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.*, No. 10 CH 31612, slip op. at 3-4 (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011) (awarding fees and expenses of $850,000 for additional disclosures) (Compendium, Tab I).

Additionally, the rates charged by Plaintiffs' Counsel are commensurate with the rates customarily charged by attorneys who actively litigate the complex and specialized practice area of shareholder actions.[21] *See* Wilson Decl., Exs. B-E; *see also Blum v. Stenson*, 465 U.S. 886, 895 (1984) (noting that reasonable fees should be calculated according to the prevailing market rates in the relevant community); *Hensley*, 461 U.S. at 447 ("[M]arket standards should prevail."). "The Supreme Court in *Blum v. Stenson* . . . held that 'reasonable fees . . . are to be calculated according to the prevailing market rates in the relevant community,' i.e., where counsel maintain their office . . ." *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992) (citing *Blum*, 465 U.S. at 895); *see also Spencer v. Comserv Corp.*, No. 4-84-794, 1986 U.S.

---

[21] *See National Law Journal 2015 Billing Survey* (reporting average partner billing rates between $715.00 and $1,055.00 per hour; and average associate billing rates between $290.00 and $678.00 per hour) (http://www.nationallawjournal.com/id=1202713809557/Billing-Rates-Rise-Discounts-Abound?slreturn=20150412191141 (Compendium, Tab J). The requested fee of $310,000 would represent an average hourly rate of approximately $523.00.

Dist. LEXIS 15863, at *32-33 (D. Minn. Dec. 30, 1986) ("Compensating a nationally recognized securities class action attorney at his hourly rate is entirely appropriate.").

Such rates necessarily reflect the reputation, experience, care, and successful record of Plaintiffs' Counsel.  "[T]he 'requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation,'" and, therefore, the rates are presumptively reasonable.  *Powell v. Comm'r of Internal Revenue*, 891 F.2d 1167, 1173 (5th Cir. 1990) (quoting *Blum*, 465 U.S. at 895-96 n.11); *see also Major v. Treen*, 700 F. Supp. 1422, 1434 (E.D. La. 1988) ("As the Supreme Court decisions have also made clear, experienced and expert attorneys who exhibit a high degree of skill have the right to have those factors calculated into the hourly rates.") (citing *Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986)).

### C.    The Experience, Reputation, and Ability of the Lawyers Performing the Services, the Time Limitations, and the Preclusion of Accepting Other Employment

The experience, reputation, and ability of Plaintiffs' Counsel support an award of attorneys' fees.  It took considerable skill to achieve the Settlement.  Specifically, to successfully litigate the Actions, Plaintiffs' Counsel had to possess expertise in corporate law governing fiduciary duties of the officers and directors, the federal securities law, as well as the knowledge to distill and analyze facts giving rise to Plaintiffs' claims from the hundreds of pages of public and confidential documents that Plaintiffs' Counsel reviewed.  Plaintiffs' Counsel are all well-respected law firms with extensive experience in class and shareholder litigation, thus giving them the ability to effectively advocate for Plaintiffs and pursue their claims.  *See* Wilson Decl., Exs. B-E.

The efforts of Plaintiffs' Counsel were not conducted in a vacuum.  Aligned against them were some of the most prominent defense counsel in the country, equally knowledgeable of

federal and Texas law and fully capable of capitalizing any misstep or weakness, who could draw upon the exceptional resources of their well-regarded regional and national law firms. The skills and abilities of defense counsel are factors that may be considered in evaluating a fee request. *See, e.g.*, *In re Delphi Corp. Sec., Deriv. & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008).

### D.   The Time and Labor Required, the Novelty and Difficulty of the Questions Involved, and the Skill Requisite to Perform the Legal Service Properly

As discussed *supra*, the legal and factual issues were complex and required Plaintiffs' Counsel to use great skill in evaluating Plaintiffs' claims under tremendous time constraints.

To pursue Plaintiffs' claims, Plaintiffs' Counsel expended approximately 592.50 hours of attorney and paralegal time in prosecuting the Actions on behalf of the Class. *See* Wilson Decl., Exs. B-E. This work was necessary, performed without duplication to the extent possible, and resulted in the Settlement, which as discussed above benefited the Class. As indicated, the regular hourly rates of Plaintiffs' Counsel (which, as discussed *supra*, are within the range charged by attorneys in similar actions) results in a total lodestar of $347,345.00. *In re Dell, Inc., Sec. Litig.*, No. A-06-CA-726-SS, 2010 U.S. Dist. LEXIS 58281, at *39 (W.D. Tex. June 11, 2010) ("[T]he lodestar method [asks the court to] multiply[] the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier."). The requested fee represents a negative multiplier, further supporting the reasonableness of the fee.[22]

### E.   Plaintiffs' Counsel Litigated the Actions on a Fully Contingent Basis

Courts in the Fifth Circuit recognize that the contingent nature of the fee also must be taken into account in awarding attorneys' fees. *See In re Prudential-Bache Energy Income*

---

[22] Included as part of the fee application is Plaintiffs' Counsels' reimbursement of $24,267.95 of unreimbursed expenses they incurred in the prosecution of the Actions.

*P'ships Sec. Litig.*, No. 888, 1994 U.S. Dist. LEXIS 6621, at *21 (E.D. La. May 18, 1994) (contingent fee awards should "fairly and adequately compensate counsel . . . for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts"); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718-19 (5th Cir. 1974); *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services.").

Plaintiffs' Counsel undertook representation in this case on a wholly contingent basis, knowing that they would devote many hours of hard work, on a compressed time-frame, to prosecute a difficult case, without any assurance of receiving fees or even reimbursement for their out-of-pocket expenses.  Accordingly, this factor supports the requested fee award.

**VII.    CONCLUSION**

For the reasons set for above, Plaintiffs respectfully request that the Court enter the accompanying Judgment and Order of Dismissal, thereby finally: (a) approving the Settlement; (b) certifying the Settlement Class for settlement purposes; and (c) approving Plaintiffs' request for reasonable attorneys' fees and reimbursement of expenses.

DATED:  July 10, 2015.

Respectfully submitted,

*/s/ Thomas E. Bilek*

Thomas E. Bilek
State Bar No. 02313525
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Liaison Counsel*

30

Nadeem Faruqi
Juan E. Monteverde
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, Tenth Floor
New York, NY  10017
Tel:  212-983-9330
Fax: 212-983-9331

Evan J. Smith
Marc L. Ackerman
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
610-667-6200
610-667-9029 (fax)

*Class Counsel*

CERTIFICATE OF CONFERENCE

I certify that Plaintiffs' counsel has conferred with Defendants' counsel, who has is not opposed to this motion.

*/s/ Thomas E. Bilek*
Thomas E. Bilek

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed via the TXW CM/ECF system on July 10, 2015, which caused an electronic copy of same to be served automatically upon all counsel of record.

*/s/ Thomas E. Bilek*
Thomas E. Bilek